IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| THE OHIO CASUALTY INSURANCE COMPANY, | § § § | |
| *Plaintiff* | § § | SA-24-CV-00668-XR |
| -vs- | § § § | |
| CJI PIPING AND FABRICATION, LLC, JEREMY HOBSON, AMY ABBOTT-HOBSON, | § § § § | |
| *Defendants* | § | |

## ORDER ON MOTION FOR DEFAULT JUDGMENT

On this date, the Court considered Plaintiff The Ohio Casualty Insurance Company's ("Ohio Casualty") Motion for Default Judgment against Defendants CJI Piping and Fabrication LLC ("CJI"), Jeremy Hobson, and Amy Abbott-Hobson ("Hobsons") (together, "Defendants"). ECF No. 17. After careful consideration, the Court **GRANTS IN PART** the motion.

## BACKGROUND

### I. Facts

This action arises out of an Indemnification Agreement. On November 3, 2022, Defendants entered into the Indemnity Agreement with Ohio Casualty, under which Ohio Casualty would issue contract surety bonds on behalf of CJI so that CJI could bid on and be awarded commercial construction projects in Texas. ECF No. 13 ¶ 8. In exchange for Ohio Casualty issuing bonds on behalf of CJI,[1] CJI and the Hobsons—as Indemnitors—agreed to "joint and severally" "exonerate,

---

[1] Under the Indemnity Agreement, "Bonds" are defined to include those "issued prior to or after the execution of the [Indemnity] Agreement." *Id.* at 8 ¶ 1.

1

indemnify and hold harmless [Ohio Casualty] from and against any and all Loss." *Id.* ¶ 10, at 8 (Indemnity Agreement, ¶ 1).[2]

**The Project.** On October 25, 2022, CJI entered a contract with Tejas Premier Building Contractor, Inc. ("Tejas Premier") to install steel pipe fencing on a project in San Antonio, Texas (the "Project"), which required CJI to obtain contract surety bonds for its work. *Id.* ¶ 11. On November 4, 2022, Ohio Casualty, under the Indemnity Agreement, issued a Performance Bond, a Payment Bond, and a Maintenance Bond in favor of Tejas Premier, each in the amount of $378,600, which guaranteed CJI's performance, payment to its subcontractors and suppliers, and repair or replacement of defective labor and materials during the maintenance period. *Id.* ¶ 12; 9–22; *see also* ECF No. 10 at 53 (increasing amount from $378,600 to $393,667).[3]

**Problems with the Project.** CJI performed some work for the Project and was paid $293,112 by Tejas Premier, but allegedly abandoned its work by October 2023. ECF No. ¶ 13. On October 16, 2023, Tejas Premier declared CJI to be in default and terminated the contract. *Id.* Upon terminating the contract, Tejas Premier demanded Ohio Casualty perform under the Performance Bond. *Id.* Michelle Wargo, the claims specialist assigned to the Performance Bond on behalf of Ohio Casualty, made repeated attempts to contact Defendants to assist in the investigation and resolution of Tejas Premier's claims, but they did not responded. *Id.*; *see* ECF No. 10 at 17–18 (Affidavit of Michelle Wargo).

---

[2] Under the Indemnity Agreement, "Loss" is defined as "[c]laims, losses, liability, damages of any type (including punitive), costs, fees, expenses, suits, orders, judgments, or adjudications whatsoever, and interest thereupon from the date upon which [Ohio Casualty] incurs a Loss . . ., which [Ohio Casualty] may incur in any manner relating to . . . Bonds and/or the enforcement of the Agreement." *Id.* Agreement includes the "Indemnity Agreement, and any other agreement between [Defendants] and [Ohio Casualty] executed for [Ohio Casualty's] benefit." *Id.* at 7.

[3] The Court refers to Ohio Casualty's First Motion for Default Judgment, ECF No. 10, as it is incorporated in its Second Motion for Default, ECF No. 17.

While Ohio Casualty obtained bids from qualified contractors to complete CJI's scope of work under its contract with Tejas Premier, it ultimately exercised its right under Section 5.4 of the Performance Bond to "determine the amount for which it may be liable to [Tejas Premier] and, as soon as practicable after the amount is determined, make payment to [Tejas Premier]." ECF No. 13 ¶ 14.[4]

On January 10, 2024, Ohio Casualty sent Defendants a letter advising them of the status of its investigation into the Performance Bond claim and anticipated costs of completing CJI's scope of work on the Project, and demanded Defendants, under the Indemnity Agreement, (i) exonerate, indemnify, and hold harmless Ohio Casualty from and against all expense on the Performance Bond, and (ii) deposit with Ohio Casualty cash collateral in the amount of $390,000 to protect Ohio Casualty from its anticipated loss on the Performance Bond. *Id.* ¶ 17; *see also* ECF No. 13 at 8 ¶ 4 (requiring Defendants to provide Ohio Casualty "funds immediately upon demand in the amount [Ohio Casualty] deems necessary to protect itself from any Loss . . . ."). Defendants, again, did not respond. ECF No. 13 ¶¶ 17–18.

**Settlement Agreement.** On March 12, 2024, Ohio Casualty and Tejas Premier executed a Settlement Agreement, discharging Ohio Casualty's obligations to Tejas Premier and resolving the claim on the Performance Bond. Under the Settlement Agreement, Ohio Casualty agreed to pay Tejas Premier $338,222. *Id.* ¶ 15. Ohio Casualty also incurred expenses for expert consultants required to assist it in its investigation and adjustment of the Performance Bond claim. *Id.* ¶ 16.

---

[4] Section 5.4 of the Performance Bond gave Ohio Casualty the right to resolve claims by "[w]aiving its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances . . . determine the amount for which it may be liable to [Tejas Premier] and, as soon as practicable after the amount is determined, make payment to [Tejas Premier]." *Id.* at 11 ¶ 5.4. And the Indemnity Agreement gave Ohio Casualty the right to pay or settle any claim on the Performance Bond. *See id.* at 8 ¶ 1 (Ohio Casualty "has the right at its sole discretion to pay or settle any Loss . . . .").

3

**Failure to Pay.** On April 10, 2024, Ohio Casualty sent Defendants another letter advising them of the loss and expenses it had occurred in connection with the Performance Bond. *Id.* ¶ 18. Ohio Casualty demanded Defendants reimburse $350,140.19 no later than April 22, 2024. *Id.*[5] Defendants, again, did not respond. *Id.*

To date, Ohio Casualty alleges it incurred losses and expenses on the Performance Bond of $351,724.19. *Id.*; *supra* note 5.

## II. Procedural History

On June 6, 2024, Ohio Casualty filed this action, asserting a claim for indemnity and seeking damages, pre- and post-judgment interest, and attorney's fees. ECF No. 1. After Defendants failed to appear, the Court ordered Plaintiff to move for entry of default and default judgment. ECF No. 7. The Clerk entered default on September 23, 2024. ECF No. 9.

On March 4, 2025, the Court ordered Ohio Casualty to file an Amended Complaint under 28 U.S.C. § 1653 to properly allege diversity jurisdiction as to CJI. ECF No. 12. Ohio Casualty did so, ECF No. 13, and this motion followed.

## DISCUSSION

### I. Legal Standard

Under Federal Rule of Civil Procedure 55(a), a default judgment is proper "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." FED. R. CIV. P. 55(a). After a default has been entered and the defendant fails to appear or move to set aside the default, the court may, on the plaintiff's motion, enter a default judgment. FED. R. CIV. P. 55(b)(2). A party is not entitled as a matter of right to default judgment, even where the defendant technically is in default. *Ganther v. Ingle,* 75 F.3d 207, 212 (5th Cir. 1996). Rather,

---

[5] This amount included $338,222 and $11,918.19 for consultant and legal costs. ECF No. 10 at 68–69. This amount increased due to additional expenses, reflected in the total amount of $351,724.19 at present. *See id.* at 75.

4

"[d]efault judgments are a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations." *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989).

In considering any motion for default judgment, a court must examine jurisdiction, liability, and damages. *Rabin v. McClain*, 881 F. Supp. 2d 758, 763 (W.D. Tex. 2012); *see also D'Costa v. Abacus FoodMart Inc.*, 4:21-CV-4031, 2023 WL 1094019, at *2 (S.D. Tex. Jan. 26, 2023), *report and recommendation adopted*, 2023 WL 2088424 (S.D. Tex. Feb. 13, 2023) ("The appropriateness of default judgment depends on '(1) whether a default judgment is procedurally warranted; (2) whether Plaintiffs' complaint sets forth facts sufficient to establish that they are entitled to relief; and (3) what form of relief, if any, Plaintiffs should receive.'" (citation omitted)).

## II. Analysis

### A. Jurisdiction

"[W]hen entry of default is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into jurisdiction both over the subject matter and the parties." *Sys. Pipe & Supply, Inc. v. M/V Viktor Turnakovskiy*, 242 F.3d 322, 324 (5th Cir. 2001) (citation omitted).

**Subject Matter Jurisdiction.** Ohio Casualty asserts an indemnity claim under state law and properly invokes the Court's diversity jurisdiction. *See* 28 U.S.C. § 1332(a). Ohio Casualty is a resident of New Hampshire, Massachusetts, and Ohio. ECF No. 13 ¶¶ 1, 6. CJI—whose sole member is Defendant Jeremy Hobson—is a resident of Texas. *Id.* ¶¶ 2, 6. The Hobsons are also residents of Texas. *Id.* ¶¶ 4–6. And Ohio Casualty seeks to recover at least $351,724.19, which satisfies the amount-in-controversy requirement.

**Service.** Absent proper service of process, a court lacks personal jurisdiction over a defendant, and any default judgment against the defendant would be void. *Rogers v. Hartford Life & Accident Ins.,* 167 F.3d 933, 940 (5th Cir. 1999). Here, Ohio Casualty filed affidavits of service indicating that the Defendants were properly served on August 7 and 13, 2024. ECF Nos. 4, 5.[6]

**Personal Jurisdiction.** The Court has general personal jurisdiction over the Defendants as Ohio Casualty pled they are residents of Texas. *See Religious Tech. Center v. Liebreich*, 339 F.3d 369, 374 (5th Cir. 2003) ("The residency of a defendant in the forum state routinely creates such systematic and continuous contact.").

### B. Liability

#### 1. Default is Procedurally Proper

Six factors inform whether default is procedurally warranted: "[(1)] whether material issues of fact are at issue, [(2)] whether there has been substantial prejudice, [(3)] whether the grounds for default are clearly established, [(4)] whether the default was caused by a good-faith mistake or excusable neglect, [(5)] the harshness of a default judgment, and [(6)] whether the court would think itself obliged to set aside the default upon the defendant's motion." *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998) (numeration added). Here, a default judgment against Defendants is procedurally proper.

First, there are no disputed issues of material fact. Ohio Casualty's allegations are deemed admitted because there is no operative "responsive pleading." *See* Fed. R. Civ. P. 8(b)(6) ("An allegation ... is admitted if a responsive pleading is required and the allegation is not denied.").

---

[6] Ohio Casualty also filed an affidavit of service indicating it served the Amended Complaint on CJI and the Hobsons. ECF No. 17-1 at 2 & n.1. As the Court noted in its Order directing Ohio Casualty to replead CJI's members for diversity jurisdiction, this was not required as the Amended Complaint does not assert a new claim. *See* ECF No. 12 at 2 n.1.

Second, Defendants' failure to appear in this matter has caused substantial prejudice to Ohio Casualty's ability to prosecute its case and "has ground the adversary process to a halt." *Joe Hand Promotions, Inc. v. Fusion Hookah, LLC*, No. 1:19-CV-618-RP, 2020 WL 6876208, at *2 (W.D. Tex. Nov. 23, 2020).

Third, the grounds for default are clearly established, as Defendants were properly served, failed to respond at any stage of the litigation, and the Clerk of the Court entered default. These circumstances foreclose any basis for claiming that their default resulted from a good-faith mistake or excusable neglect, or that the entry of default judgment would be unduly harsh, the fourth and fifth factors. Nor is the Court aware of any facts that give rise to "good cause" to set aside default if challenged by Defendants.

### 2. The Complaint Provides a Sufficient Basis for Default Against Defendants

The Court now looks to the substantive merits of Ohio Casualty's claims.

"The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact [and] is concluded on those facts by the judgment . . . ." *Jackson v. FIE Corp.*, 302 F.3d 515, 524 (5th Cir. 2002) (quoting *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). Although the Court must accept the plaintiff's well-pleaded facts as true, the Court then asks whether there is a "sufficient basis in the pleadings for the judgment entered." *Nishimatsu Constr.*, 515 F.2d at 1206; *see also* 10A Wright, Miller et al., FED. PRAC. & PROC. CIV. § 2688 (3d ed. 2002) ("Even after default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.").

In other words, "whether the factual allegations in the complaint—apart from those about damages—if taken as true, would state a claim upon which relief can be granted." *D'Costa*, 2023

7

WL 1094019, at *3. This threshold is lower than the standard for surviving a motion to dismiss under Rule 12(b)(6). *See Wooten v. McDonald Transit Assocs., Inc.*, 788 F. 3d 490, 499-500 (5th Cir. 2015) (holding that the allegations need only provide fair notice of the claim under Rule 8, particularly when the defaulting defendant chose to forgo moving for dismissal or for a more definite statement under Rule 12(b)(6) or 12(e)); Fed. R. Civ. P. 8(a)(2) (requiring a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief").

Ohio Casualty alleges that Defendants breached the Indemnity Agreement. A breach of indemnity agreement claim in Texas has five elements: "(1) the existence of a valid indemnity agreement; (2) the agreement obligated the defendant to indemnify the plaintiff in the event claims were made on the bonds issued; (3) claims were actually made on the bonds issued; (4) all conditions precedent for recovery have occurred, been performed, waived, or excused; and (5) breach of the agreement caused the plaintiff's damages." *Great Am. Ins. Co.. LC Paving & Construction, LLC*, No. 6:21-CV-1028-ADA, 222 WL 718796, at *3 (W.D. Tex. Mar. 10, 2022) (citing *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 719 (5th Cir. 1995)). "Like other contracts in Texas, indemnity agreements should be interpreted to give effect to the parties intent as expressed in the agreement." *Id.*; *see also Travelers Cas. & Sur. Co. of Am. v. Padron*, No. 5:15-CV-200-DAE, 2019 WL 1602018, at *5 (W.D. Tex. Mar. 22, 2019) ("When the terms of an indemnity agreement are clear and unambiguous, Texas law gives effect to the agreement as written.").

Ohio Casualty has sufficiently alleged a breach of the Indemnity Agreement. The language of the Indemnity Agreement is clear—Defendants, "jointly and severally," must "exonerate, indemnity, and hold harmless" Ohio Casualty from "all Loss," including damages, fees, and expenses "relating to" the Performance Bond or "enforcement of" the Indemnity Agreement. ECF

8

Nos. 10 at 4; 13 at 8 ¶ 1. Ohio Casualty suffered losses related to procuring and executing the Performance Bond for Defendants: CJI defaulted, Tejas Performing made a claim on the Performance Bond, and Ohio Casualty exercised its right under the Indemnity Agreement to settle the claim. When Ohio Casualty sent Defendants a demand letter, Defendants did not make a deposit and failed to fulfil their obligations under the Indemnity Agreement. Indeed, Defendants consistently ignored all of Ohio Casualty's communications. Ohio Casualty further alleged that all conditions precedent to recover under the Indemnity agreement have "occurred or have been performed, executed or waived." ECF No. 13 ¶ 18. At the time Ohio Casualty filed its Complaint, it estimated a loss of more than $350,000.

Accordingly, assuming the alleged facts are true, Ohio Casualty has satisfied the elements for breach of the Indemnity Agreement.

### C. Damages and Fees

While Plaintiff has stated a plausible claim for relief, a default judgment is a judgment on the merits that conclusively establishes the defendant's liability. It does not establish the amount of damages. *United States v. Shipco Gen. Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987).

Damages awarded in a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." FED. R. CIV. P. 54(c). Usually, non-liquidated damages are proven at a hearing. *See James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993) (explaining the general rule that non-liquidated damages in default judgment are not awarded without an evidentiary hearing). But where a mathematical calculation of unliquidated damages is possible with reference to adequately detailed affidavits, a hearing is unnecessary. *Id.* The plaintiff has the burden to provide an evidentiary basis for the damages it seeks. *Broadcast Music, Inc. v. Bostock Billiards & Bar Assoc.*, No. 3:12-CV-413-B, 2013 WL 12126268, at *3 (N.D. Tex. Jan. 18, 2013).

Ohio Casualty seeks monetary damages, pre- and post-judgment interest, and attorney's fees.

### 1. Damages

**Monetary Damages.** Under the unambiguous terms of the Indemnity Agreement, Defendants are "jointly and severally" obligated to indemnify Ohio Casualty for any costs or expenses incurred relating to the Performance Bond. ECF No. 13 at 8 ¶ 1. Plaintiff provides evidentiary support—the Settlement Agreement, a spreadsheet separating the Settlement Claim of $338,220 and the $13,502 in investigation expenses,[7] and an affidavit from Michelle Wargo, the claims specialist assigned to investigate the Performance Bond claim—that demonstrate the suffered loss was $351,724.19. ECF Nos 10 at 11, 15–20, 71–75.

The Court concludes this is sufficient evidence to support Ohio Casualty's claim for damages resulting from a breach of the Indemnification Agreement.

**Pre-Judgment Interest.** "State law governs the award of prejudgment interest in diversity cases." *Meaux Surface Protection, Inc. v. Fogelman*, 607 F.3d 161, 172 (5th Cir. 2010) (quoting *Harris v. Mickel*, 15 F.3d 428, 429 (5th Cir. 1994)). "The Texas Supreme Court recognizes two separate bases for the award of prejudgment interest: (1) an enabling statute; and (2) general principles of equity." *In re Okedokun*, 968 F.3d 378, 392 (5th Cir. 2020).

Ohio Casualty seeks "prejudgment interest" under Section 302.002 of the Texas Finance Code. ECF No. 10 at 12.[8] Reliance on Section 302.002, however, is misplaced. "While Section 302.002 once provided for prejudgment interest at a rate of 6%, such statute was repealed many

---

[7] These investigation expenses include (i) $13,422.19 to J.S. Held, an expert consultant specializing in the investigation and adjustment of the Performance Bond claim, for its services, including travel expenses in the amount of $1,445.19, and (ii) $80 to Kazlow & Fields, a credit investigation firm, for preparing and recording financing statements. ECF No. 10 at 19.

[8] The Indemnity Agreement defines "interest" as "interest thereupon," which is preceded by a list of terms including "judgments." ECF No. 13 at 8.

years ago. This section, as currently drafted, expressly excludes prejudgment interest awards." *NextGear Capital, Inc. v. Druien, Inc.*, No. 4:20-CV-959-BJ, 2021 WL 12315255, at *4 n. 7 (N.D. Tex. Nov. 2, 2021) (citing *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 499 (5th Cir. 2002) and TEX. FIN CODE § 301.002(a)(8)).

Ohio Casualty does not have a statutory right to prejudgment interest. *See* TEX. FIN. CODE § 304.103 (providing for prejudgment interest in wrongful death, personal injury, or property damage cases). But equity supports an award of prejudgment interest. *See, e.g., Arch Ins. Co. v. WM Masters & Associates, Inc.*, No. 3:12-CV-2092-M, 2013 WL 145502, at *5 (N.D. Tex. 2013) (awarding prejudgment interest on damages resulting from breach of indemnity agreement). Under Texas law, "equitable prejudgment interest, which focuses on the need to compensate a plaintiff for the defendant's beneficial use of the damage funds between the time the injury occurred and the time the judgment was rendered, is available as a matter of course, absent exceptional circumstances." *In re Okedokun*, 968 F.3d at 392 (5th Cir. 2020) (citing *Joy Pipe, USA, L.P. v. ISMT Ltd.*, 703 F. App'x 253, 257 (5th Cir. 2017)).

In Texas, prejudgment interest is set at the greater of the prime rate as published by the Board of Governors of the Federal Reserve System, or 5%. *See Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410, 415 (5th Cir. 2011); TEX. FIN. CODE. § 304.003(c)(1)–(2).

Given that the current prime rate is 7.5%,[9] the Court assesses prejudgment interest at an annual rate of 7.5% from March 18, 2024—180 days after Ohio Casualty provided written notice of its claim to Defendants—until the date preceding this final judgment.[10] *See Fairmont Specialty*

---

[9] *See* Bd. of Governors of the Fed. Reserve Sys., *Selected Interest Rates (Weekly)* (May 22, 2025), http://www.federalreserve.gov/releases/h15/ (reporting that the prime rate as of May 22, 2025 is 7.5%).

[10] The Court notes that this amount is *greater* than Ohio Casualty seeks. But the Court cannot award Ohio Casualty interest under a repealed statute, so Ohio Casualty reaps an unexpected benefit.

*Ins. Co. v. Apodaca*, 234 F. Supp. 3d 843, 855 (S.D. Tex. 2017); TEX. FIN. CODE § 304.104 (prejudgment interest "accrues on the amount of a judgment during the period beginning on the *earlier* of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered" and "is computed as simple interest and does not compound.") (emphasis added).[11]

This amount will accrue only as to damages, not attorney's fees. *See Giddy Up, LLC v. Prism Graphics, Inc.*, No. 3:6-CV-948-B, 2007 WL 3125312, at *1 (N.D. Tex. Oct. 24, 2007).

**Post-Judgment Interest.** Ohio Casualty seeks post-judgment interest of eighteen percent under Texas Financial Code Sections 304.002 and 304.005. But federal law governs the award of post judgment interest on "any judgment in a civil case recovered in a district court, . . . including actions based on diversity of citizenship." *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 689 (5th Cir. 1989); *Travelers Ins. Co. v. Liljeberg Enters., Inc.,* 7 F.3d 1203, 1209 (5th Cir. 1993). Accordingly, the Court will instead award post-judgment interest at the statutory rate under 28 U.S.C. § 1961.

### 2. Attorney's Fees

An award of attorney's fees is governed by the same law that determines the substantive issues of the case. *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) ("State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision."). "Under Texas law, attorneys' fees may not be recovered unless provided for by statute or contract." *Trujillo v. Wells Fargo Bank, N.A.*, No. H-13-CV-2444, 2014 WL 6886074, at *5 (S.D. Tex. Dec. 4, 2014) (citing *Dallas Cent. Appraisal Dist.* v. *Seven Inv. Co.*, 835 S.W.2d 75, 77 (Tex. 1992). Attorney's fees are mandatory under Section 38.001 of the Texas Civil Practice and

---

[11] March 8, 2024 is earlier than June 5, 2024, when Ohio Casualty filed its Original Complaint.

Remedies Code when the plaintiff prevails on a breach of contract claim and recovers damages. *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 603 (5th Cir. 2000) (citing *Green Int'l Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex. 1997)); *Gupta v. Martin*, No. 1-23-CV-1191-RP, 2024 WL 3620314, at * 2 (W.D. Tex. Aug. 1, 2024), *report and recommendation adopted*, 2024 WL 3898109 (W.D. Tex. Aug. 21, 2024) ("Although 'may' is used within the statute's text, courts have determined that fees are required when the matter concerns a breach of contract." (citing *Kona*, 222 F.3d at 603)). "The amount of reasonable fees, however, is discretionary." *Gupta*, 2024 WL 3620314, at *2.

To recover attorney's fees, the plaintiff must prove the fees were necessary and reasonable to adjudicate the claim. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818-19 (Tex. 1997). There is a rebuttable presumption that usual and customary fees are reasonable. TEX. CIV. PRAC. & REM. CODE § 38.003. The Court may take judicial notice of reasonable and customary fees, along with the case file. *Id.* § 38.004. But the Court may still review the requested attorney's fees for their reasonableness even though the motion is unopposed. *See*, e.g., *Harvey v. Baton Rouge Marine Contractors*, No. 8-CV-459-VP-CN, 2009 WL 331594, at *7 (M.D. La. Feb. 10, 2009) (reviewing the reasonableness of attorney's fees even though the request was unopposed).

Texas courts use the "lodestar method" for proving the reasonableness and necessity of attorney's fees. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 501 (Tex. 2019). The base lodestar is calculated by multiplying the number of reasonable hours worked on the case multiplied by a reasonable hourly rate. *Id*. The party seeking attorney's fees must prove the attorney's reasonable hours worked and reasonable rate by presenting evidence that is sufficient to support the fees sought. *Id*. At a minimum, sufficient evidence includes (1) the

13

particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services. *Id*. Once the lodestar has been calculated, it can be adjusted up or down when considerations not already accounted for in calculating the base are present. *Rohrmoos*, 578 S.W.3d at 502.

In Texas, the uncontroverted testimony or affidavit of an attorney testifying to the attorney's qualifications, reasonableness of the attorney's fees, and the basis for the opinion may be sufficient to support award of attorney's fees. *See Fuhrmann v. C&J Gray Invs. Partners, Ltd.*, No. 05-18-00683-CV, 2019 WL 3798181, at *4 (Tex. App.—Dallas Aug. 13, 2019) (determining attorney's uncontroverted affidavit as to number of hours that he worked, nature of work performed, and his hourly rate was sufficient to support plaintiff's request for attorney's fees submitted in support of a motion for summary judgment); *see also Clary Corp. v. Smith*, 949 S.W.2d 452, 469 (Tex. App.—Fort Worth 1997, no writ) ("Where . . . trial counsel's testimony concerning attorney's fees is clear, positive, and direct, and uncontroverted, it is taken as true as a matter of law. This is especially true where the opposing party had the means and opportunity of disproving the testimony, if it were not true, and failed to do so.") (citing *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990)).

Plaintiff seeks attorney's fees of $10,007.50. ECF No. 10 at 12. In support of its proposed award, Plaintiff submits an affidavit from its counsel, Thomas H. Duke, that (1) sets out the hourly rates for the attorneys and paralegals who worked on the case ($300/hour for counsel, and $125 to $150 for two paralegals), (2) states that the rates are reasonable considering the individuals experience, skill, and ability, and (3) submits that the fees incurred are reasonable and customary. *Id.* at 76–80 (Duke Affidavit). The Duke Affidavit represents that Mr. Duke has practiced for over

thirty years, including time as an Assistant United States Attorney in the Southern District of Florida. The Duke Affidavit reflects an hourly rate of $300 for the services of counsel (discounted from his usual rate of $400/hour), and $125 to $150/hour for paralegals. It represents that Mr. Duke spent 23.4 hours on this matter, that one paralegal spent 16.16 hours (at $150/hour), and another spent 4.5 hours (at $125/hour).[12] The Duke Affidavit also attaches invoices for time spent. *Id.* at 81–88.

Based on the Court's review of the invoices and the Duke Affidavit, the Court finds that the number of hours worked by the attorneys in prosecuting this case is reasonable.[13] The Court finds the hourly rate of $300 for counsel and $125 and $150 to be reasonable. *See Villarreal v. Saenz*, No 5:20-CV-571-OLG, 2022 WL 19572593, at *6 (W.D. Tex. Nov. 30, 2022), *report and recommendation adopted*, 2023 WL 3069399 (W.D. Tex. Jan. 11, 2023) (finding $300/hour for counsel to be reasonable); *Houston v. Texas Auto Save, LLC*, No. SA-19-CV-1018-XR, 2020 WL 1931850, at *2 (W.D. Tex. April 21, 2020) (finding $135/hour for paralegal services to be reasonable).

Accordingly, the lodestar amount of $10,007.50 is reasonable. *See Perdue v. Kenny A. ex. Rel. Winn*, 559 U.S. 542, 553–54 (2010) ("Once the lodestar amount is determined, there is a strong

---

[12] "When obtaining payment for work done by paralegals or legal assistants, Texas courts have required more information." *Mid-Continent Cas. Co. v. Petroleum Sols, Inc.*, No. CV 4:09-0422, 2017 WL 6942658, at *5 (S.D. Tex. Sept. 21, 2017) (citing *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012) (requiring (among other requirements) the qualifications of the legal assistant and whether the substantive legal work was performed under the direction and supervision of an attorney).

The Duke Affidavit sufficiently explains the nature of the paralegals' work, including that they performed "limited research, drafted or assisted in the drafting of the motion for default entered by the clerk and the motion for entry of default judgment and supporting affidavits and worked with the process server to obtain and file the returns of service on [Defendants]." ECF No. 10 at 78–79. The Duke Affidavit also explains the $25/hour differential—the higher-billed paralegal is a law school graduate and, as of October 2024, was studying to take the Texas Bar Exam.

[13] The Court notes that Ohio Casualty does *not* seek attorney's fees for time spent working on the Amended Complaint nor the Second Motion for Default, which the Court would not have awarded.

presumption that it represents a reasonable fee."). The Court sees no reason to depart from this amount.

## CONCLUSION

For the forgoing reasons, Ohio Casualty's Motion for Default Judgment (ECF No. 17) is **GRANTED IN PART**. Plaintiff The Ohio Casualty Insurance Company is awarded $351,724.19 in damages and $10,007.50 in attorney's fees. Plaintiff shall receive pre-judgment interest on $351,724.19 at the annual rate of 7.5% from March 18, 2024 until the date preceding the entry of final judgment. Plaintiff shall also receive post-judgment interest under 28 U.S.C. § 1961.

**IT IS FURTHER ORDERED** that Defendants CJI Piping and Fabrication, LLC, Jeremy Hobson, and Amy Abbott-Hobson are **JOINTLY AND SEVERALLY LIABLE** for the damages, pre- and post-judgment interest, and attorney's fees.

A final judgment under Rule 58 will issue separately.

**IT IS FURTHER ORDERED** that the Clerk of the Court is **DIRECTED** to **CLOSE THIS CASE**.

**IT IS SO ORDERED**.

**SIGNED** this 23rd day of May, 2025.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE